## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KENDALL HAWK, LISA BRYSON, TRINITY WHALEY, KATELYN CROWE and ABBEY ROBINSON, individually and as mother and next friend of J.R., minor, *on behalf of themselves and all others similarly situated*, <br><br> *Plaintiffs*, <br><br> v. <br><br> HEALTHEC, LLC, <br><br> *Defendants*, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No.:  2:24-cv-00697

**JURY TRIAL DEMANDED**

## COMPLAINT – CLASS ACTION

Plaintiffs, Kendall Hawk, Lisa Bryson, Trinity Whaley, Katelyn Crowe and Abbey Robinson, individually and as mother and next friend of J.R., minor (collectively, "Plaintiffs"), individually, on behalf of themselves and all others similarly situated, brings this action against Defendant HEALTHEC, LLC, and allege as follows:

## NATURE OF THE ACTION

1.      This is a civil action seeking monetary damages and injunctive and declaratory relief from HEALTHEC, LLC, ("HealthEC"), arising from its failure to safeguard certain Personally Identifying Information[1] and Protected Health Information[2] (collectively, "PII") of

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, Plaintiffs is not asserting that every example of identifying information was compromised in the Data Breach.

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.* ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. A "covered entity" is further defined as, *inter alia*, a health care provider who

millions of its patients. Consequently, a staggeringly broad spectrum of those patients' PII—including their names, addresses, dates of birth, Social Security numbers, Taxpayer identification numbers, Medical Record numbers, Medical information (including but not limited to Diagnosis, Diagnosis Code, Mental/Physical Condition, Prescription information, and provider's name and location), Health insurance information (including but not limited to beneficiary number, subscriber number, Medicaid/Medicare identification), and/or Billing and Claims information (including but not limited to patient account number, patient identification number, and treatment cost information)—has been compromised.[3]

2.      According to its Notice of the HealthEC LLC Cyber Security Event (HealthEC's "Notice"), HealthEC "became aware of suspicious activity potentially involving its network…", although HealthEC does not say when it became aware.[4] Upon investigating, HealthEC "determined that certain systems were accessed by an unknown actor between July 14, 2023 and July 23, 2023, and during that time certain files were copied…", which contained the confidential and sensitive PII for 4,452,782[5] current and former patients of HealthEC (the "Data Breach").[6]

3.      That means that cybercriminals infiltrated HealthEC's data systems on July 14, 2023, and had *eight days* to exfiltrate the sensitive and confidential PII therein before they escaped

---

transmits any health information in electronic form in connection with a transaction covered by HIPAA. *Id. Covered entity*. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa /for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). HealthEC is clearly a "covered entity" and the data compromised in the Data Breach that this action arises out of is "protected health information", subject to HIPAA.

[3] *Notice of the HealthEC LLC Cyber Security Event*, HEALTHEC, LLC., *available at* https://www.healthec.com/cyber-incident/ (last accessed Jan. 26, 2024). Plaintiffs also received similar letters from HealthEC, which are attached hereto.

[4] *Ibid.*

[5] *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES OFFICE FOR CIVIL RIGHTS, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Jan. 26, 2024).

[6] *Notice of HealthEC LLC Cyber Security Event*, *supra* note 3.

unscathed and *undetected*—until on or about July 23, 2023. Eight days is an eternity for cybercriminals to have unfettered access to a covered entity's data systems, as evidenced by the breathtaking scope of the PII that they managed to pilfer.

4.      Indeed, HealthEC reported to the Office of the Maine Attorney General that it did not discover the breach until *more than three months later*, on or about October 24, 2023, which explains why HealthEC declined to tell patients when it discovered the breach.[7]

5.      As will be more fully explained below, Plaintiffs and members of the Class have been significantly injured by the Data Breach and have incurred out-of-pocket expenses associated with the reasonable mitigation measures they were forced to employ. Plaintiffs and the Class also now forever face an amplified risk of fraud and identity theft due to their sensitive PII falling into the hands of cybercriminals.

6.      On behalf of themselves and the Class preliminarily defined below, Plaintiffs bring causes of action sounding in negligence, *per se* negligence, invasion of privacy, breach of confidence, breach of contract, including breach of the covenant of good faith and fair dealing, trespass to chattels, bailment, unjust enrichment, and conversion. Plaintiffs seek damages and injunctive and declaratory relief arising from HealthEC's failure to adequately protect their highly sensitive PII.

## **PARTIES**

7.      Plaintiff Kendall Hawk is a natural person and resident of Springfield, Tennessee, where she intends to remain. Plaintiff Kendall Hawk is a licensed professional counselor and had

---

[7] *See Office of the Maine AG: Consumer Protection Privacy, Identity Theft and Data Security Breaches*, OFFICE OF THE MAINE ATTORNEY GENERAL, *available at* https://apps.web.maine.gov/online/aeviewer/ME/40/4680936e-e496-43ed-a35d-59ece9b523b6.shtml, (last accessed Jan. 26, 2024). Indeed, since HealthEC notified the Office of the Maine Attorney General of the Data Breach, which means that Defendants have "conduct[ed] in good faith a reasonable and prompt investigation to determine the likelihood that personal information has been or will be misused and… [they determined that] *personal information has been, or is reasonably believed to have been, acquired by an unauthorized person.*" 10 M.R.S.A. § 1348 (emphasis added).

a contract with the State of Tennessee, Division of TennCare, as a provider at the time of the data breach. Plaintiff Kendall Hawk's PII was stored on HealthEC's data systems at all times material hereto. Plaintiff Kendall Hawk received a Notice Letter from HealthEC informing her that she was a victim of the Data Breach, which is annexed hereto.

8.      Plaintiff Lisa Bryson is a natural person and resident of Pikeville, Tennessee, where she intends to remain. Plaintiff Lisa Bryson received medical treatment related services through the State of Tennessee, Division of TennCare. Plaintiff Lisa Bryson's PII was stored on HealthEC's data systems at all times material hereto. Plaintiff Lisa Bryson received a Notice Letter from HealthEC informing her that she was a victim of the Data Breach, which is annexed hereto.

9.      Plaintiff Trinity Whaley is a natural person and resident of Madison, Tennessee, where she intends to remain. Plaintiff Trinity Whaley received medical treatment related services through the State of Tennessee, Division of TennCare. Plaintiff Trinity Whaley's PII was stored on HealthEC's data systems at all times material hereto. Plaintiff Trinity Whaley received a Notice Letter from HealthEC informing her that she was a victim of the Data Breach, which is annexed hereto.

10.      Plaintiff Katelyn Crowe is a natural person and resident of Spring City, Tennessee, where she intends to remain. Plaintiff Katelyn Crowe received medical treatment related services through the State of Tennessee, Division of TennCare. Plaintiff Katelyn Crowe's PII was stored on HealthEC's data systems at all times material hereto. Plaintiff Katelyn Crowe received a Notice Letter from HealthEC informing her that she was a victim of the Data Breach, which is annexed hereto.

11.      Plaintiff Abbey Robinson is a natural person and resident of Carthage, Tennessee, where she intends to remain. Plaintiff Abbey Robinson received medical treatment related services through the State of Tennessee, Division of TennCare. Plaintiff Abbey Robinson's PII was stored on HealthEC's data systems at all times material hereto. Plaintiff Abbey Robinson received a Notice Letter from HealthEC informing her that she was a victim of the Data Breach, which is annexed hereto.

12.     Plaintiff Abbey Robinson's son J.R., a minor, is a resident of Carthage, Tennessee, where he intends to remain. Plaintiff's son, J.R., received medical treatment related services through the State of Tennessee, Division of TennCare. Minor J.R.'s PII was stored on HealthEC's data systems at all times material hereto. Plaintiff Abbey Robinson received a Notice Letter from HealthEC informing her that her son J.R. was a victim of the Data Breach, which is annexed hereto. Since J.R. is a minor, he lacks capacity to bring this civil action. Plaintiff Abbey Robinson is truly dedicated to her child's interests as his mother and brings this action as his mother and next friend herein.

13.     Defendant HealthEC is a Limited Liability Company organized under the laws of the State of Delaware which provides population health technology services, and its principal place of business is located at 343 Thornall Street, #630, Edison, New Jersey 08837.

## JURISDICTION

14.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because it is brought on behalf of a proposed class with at least 100 members for whom the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and Plaintiffs and other members of the class are citizens of a State and/or States different from HealthEC.

15.     This Court has general personal jurisdiction over HealthEC because HealthEC's principal place of business is in New Jersey, and it regularly transacts business within the State, such that it is at home within the forum.

## VENUE

16.     Venue is proper in this Court under 28 U.S.C. §§ 1391(a)(2), (b)(2) & (c)(2) because a substantial part of the events giving rise to the claims arise from HealthEC's business activities in this District.

**FACTUAL ALLEGATIONS**

**A. Plaintiffs and the Class Members entrusted their PII to HealthEC**

17.     Plaintiffs and the members of the Class are individuals who entrusted their PII and their children's PII to HealthEC and/or a covered entity that utilized HealthEC's services.

18.     As a condition for receiving the population health technology services utilized by their treatment providers, Class members were required by HealthEC to confide and make available to it, its agents, and its employees, sensitive and confidential PII, including, but not limited to, names, addresses, dates of birth, Social Security numbers, Taxpayer identification numbers, Medical Record numbers, Medical information (including but not limited to Diagnosis, Diagnosis Code, Mental/Physical Condition, Prescription information, and provider's name and location), Health insurance information (including but not limited to beneficiary number, subscriber number, Medicaid/Medicare identification), and/or Billing and Claims information (including but not limited to patient account number, patient identification number, and treatment cost information).

19.     HealthEC acquired, collected, and stored a massive amount of PII of Class members.

20.     By obtaining, collecting, using, and deriving a benefit from those individuals' PII, HealthEC assumed legal and equitable duties to those individuals and knew or should have known that it was responsible for protecting their PII from unauthorized disclosure.

21.     Plaintiffs have taken reasonable steps to maintain the confidentiality of their PII and their children's PII. Plaintiffs relied on HealthEC to keep that PII confidential and securely maintained, to use that information for business purposes only, and to make only authorized disclosures of that information.

22.     Plaintiffs entrusted their PII and their children's PII to HealthEC solely for the purpose of attaining population health technology services utilized by their healthcare providers and arranging the payment therefor with the expectation and implied mutual understanding that

HealthEC would strictly maintain the confidentiality of that information and safeguard it from theft or misuse.

23.     Plaintiffs would not have entrusted HealthEC with that highly sensitive PII if they had known that HealthEC would not maintain it securely and protect it from unauthorized use or disclosure.

**B. The security of patients' PII was compromised in the Data Breach**

24.     Plaintiffs Hawk, Bryson, Whaley, Crowe, Robinson and Plaintiff Robinson's minor child were patients of healthcare providers or healthcare providers that utilized HealthEC's services.

25.     Prior to and/or contemporaneously with utilizing HealthEC's services, its agents and/or Plaintiffs' healthcare providers provided Plaintiffs with various disclosure statements regarding their obligations under HIPAA to safeguard patients' PII—as HealthEC and/or Plaintiffs' healthcare providers were required to do by law.[8]

26.     As a prerequisite to receiving those services from HealthEC, Plaintiffs divulged their personal and sensitive PII or their children's PII to it, with the implicit understanding that it would be kept confidential. This understanding was based on all the facts and circumstances attendant to their receipt of care, and the express, specific, written representations made by HealthEC and its agents.

27.     Plaintiffs reasonably relied upon HealthEC's representations to their detriment and would not have provided their sensitive PII to HealthEC but for HealthEC's explicit and implicit promises to adequately safeguard that information.

28.     On or about December 22, 2023, HealthEC notified Plaintiffs and all Class members that their and their family members' PII had been compromised during the Data Breach.[9]

29.     According to HealthEC, it "became aware of suspicious activity potentially involving its network…", and, upon investigation, "determined that certain systems were accessed

---

[8] *See, e.g.*, 45 C.F.R. § 164.520(c)(2)(iii)(B).
[9] *Notice of HealthEC LLC Cyber Security Event*, *supra* note 3.

by an unknown actor between July 14, 2023 and July 23, 2023, and during that time certain files were copied…"[10]

30.     HealthEC further explained that the unknown actor(s) gained access to a panoply of sensitive and confidential PII including "name, address, date of birth, Social Security number, Taxpayer Identification number, Medical Record number, Medical information (including but not limited to Diagnosis, Diagnosis Code, Mental/Physical Condition, Prescription information, and provider's name and location), Health insurance information (including but not limited to beneficiary number, subscriber number, Medicaid/Medicare identification), and/or Billing and Claims information (including but not limited to patient account number, patient identification number, and treatment cost information)."[11]

31.     As a result of the Data Breach, the PII of 4,452,782 current and former HealthEC patients was compromised.[12]

32.     HealthEC's Notice did not explain how the Data Breach happened, who perpetrated it, whether a ransom was demanded or paid, or when HealthEC discovered that their data systems had been infiltrated.

33.     It turns out HealthEC did not even discover the Data Breach until more than three months after it happened.[13]

34.     The Data Breach was far reaching. According to HealthEC, the Data Breach impacted the following covered entities which utilized HealthEC's services:

- Corewell Health

- HonorHealth

- University Medical Center of Princeton Physicians' Organization

---

[10] *Ibid.*
[11] *Ibid.*
[12] *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES OFFICE FOR CIVIL RIGHTS, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Jan. 26, 2024).
[13] *See Office of the Maine AG: Consumer Protection Privacy, Identity Theft and Data Security Breaches*, *supra*, n.7.

- Community Health Care Systems

- State of Tennessee, Division of TennCare

- Beaumont ACO

- KidneyLink

- Alliance for Integrated Care of New York, LLC

- Compassion Health Care

- Metro Community Health Centers

- Advantage Care Diagnostic & Treatment Center, Inc.

- Long Island Select Healthcare

- Mid Florida Hematology & Oncology Centers, P.A, d/b/a Mid-Florida Cancer Centers

- Illinois Heath Practice Alliance, LLC

- East Georgia Healthcare Center

- Hudson Valley Regional Community Health Centers, and

- Upstate Family Health Center, Inc.[14]

35. The Data Breach was preventable and a direct result of HealthEC's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect patients' PII.

36. Further, upon information and belief, it appears that HealthEC became aware of the Data Breach on or about October 24, 2023, yet it neglected to inform Plaintiffs and the Class until nearly two months later, on or about December 22, 2023.

**C. Healthcare providers like HealthEC are a prime target for cybercriminals**

37. Over the past several years, data breaches have become alarmingly commonplace. In 2016, the number of data breaches in the U.S. exceeded 1,000, a 40% increase from 2015.[15] The

---

[14] *Notice of HealthEC LLC Cyber Security Event*, *supra* note 3.

[15] *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout*, IDENTITY THEFT RESOURCE CENTER ("ITRC") (Jan. 19, 2017), https://www.idtheftcenter.org/data-breaches-increase-40-percent-in-2016-finds-new-report-from-

next year, that number increased by nearly 50%.[16] The following year, the healthcare sector was the second easiest "mark" among all major sectors and categorically had the most widespread exposure per data breach.[17]

38.    Hospital data breaches have continued to rapidly increase. According to the 2019 Healthcare Information and Management Systems Society Cybersecurity Survey, 82 percent of participating hospitals reported having a significant security incident within the last 12 months, with a majority of those being caused by "bad actors."[18]

39.    Covered entities "have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[19]

40.    Upon information and belief, the Data Breach happened because HealthEC neglected to institute rudimentary data security best practices, including:

   a.    Leveraging Windows Defender Exploit Guard, which employs attack surface reduction, network protection and controlled folder access.

   b.    Implementing threat intelligence solutions.

   c.    Employing next-generation antivirus.

   d.    Implementing strong patch management protocols.

---

identity-theft-resource-center-and-cyberscout/.

[16] *2017 Annual Data Breach Year-End Review*, ITRC, (Jan. 25, 2018), https://www.idtheftcenter.org/images/breach/2017Breaches/2017AnnualDataBreachYearEndReview.pdf.

[17] *2018 End-of-Year Data Breach Report*, ITRC, (Feb. 20, 2019), https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

[18] *2019 HIMSS Cybersecurity Survey*, HEALTHCARE INFORMATION AND MANAGEMENT SYSTEMS SOCIETY, INC. (Feb. 8, 2019), https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf.

[19] Benishti, Eyal, *How to Safeguard Hospital Data from Email Spoofing Attacks*, INSIDE DIGITAL HEALTH, (Apr. 4, 2019), https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

e.    Employing input validation.

f.    Employing an AI-powered cybersecurity solution.

g.    Ensuring use of mobile threat prevention.

h.    Implementing a strong data backup system.

i.    Maintaining an adequate incident response plan.[20]

41.    Additionally, HealthEC could have instituted the following data security measures to prevent the Data Breach:

a.    Configure firewalls to block access to known malicious IP addresses.

b.    Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

c.    Execute operating system environments or specific programs in a virtualized environment.

d.    Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[21]

42.    The PII stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach—dates of birth, member identification numbers, dates of health plan coverage, etc.—is difficult, if not impossible, to change.

43.    This data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card

---

[20] *Top 10 zero day attack prevention best practices 2022*, CyberTalk (June 14, 2022), *available at* https://www.cybertalk.org/2022/06/14/top-10-zero-day-attack-prevention-best-practices-2022/.
[21] Natalie Goriel, *14 Tips to Protect Your business from Ransomware Attacks*, U.S. Small Bus. Admin. (May 18, 2017), *available at* https://www.sba.gov/blog/14-tips-protect-your-business-ransomware-attacks.

information, personally identifiable information… [is] worth more than 10x on the black market."[22] Likewise, the FBI has warned healthcare organizations that PII data is worth 10 times as much as personal credit card data on the black market.[23]

44.    PII data for sale is so valuable because PII is so broad, and it can therefore be used for a wide variety of criminal activity such as creating fake IDs, buying medical equipment and drugs that can be resold on the street, or combining patient numbers with false provider numbers to file fake claims with insurers.

45.    The value of Plaintiffs' and their children's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

46.    As storehouses of that lucrative information, covered entities are also highly targeted by cybercriminals because, "primarily due to budget and resources, [their] security systems are often less sophisticated and decentralized than those in other industries, such as financial services," making them an easier target.[24]

**D. HealthEC failed to sufficiently protect the PII that patients had entrusted to it**

i.    HealthEC failed to adhere to HIPAA

47.    HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly

---

[22] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.
[23] Stolen PHI health credentials can sell for up to 20 times the value of a U.S. credit card number, according to Don Jackson, director of threat intelligence at PhishLabs, a cyber-crime protection company who obtained his data by monitoring underground exchanges where cyber-criminals sell the information. *See* Humer, Caroline & Finkle, Jim, *Your medical record is worth more to hackers than your credit card*, REUTERS, (Sep. 24, 2014), https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924. Dark web monitoring is a commercially available service which, at a minimum, HealthEC can and should perform (or hire a third-party expert to perform).
[24] Benishti, *supra* note 19.

known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[25]

48.     HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII is properly maintained.[26]

49.     HealthEC's Data Breach resulted from a combination of inadequacies showing it failed to comply with safeguards mandated by HIPAA. HealthEC's security failures include, but are not limited to:

   a.     Failing to ensure the confidentiality and integrity of electronic PII that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

   b.     Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PII in violation of 45 C.F.R. § 164.306(a)(2);

   c.     Failing to protect against any reasonably anticipated uses or disclosures of electronic PII that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

   d.     Failing to ensure compliance with HIPAA security standards by HealthEC's workforce in violation of 45 C.F.R. § 164.306(a)(4);

   e.     Failing to implement technical policies and procedures for electronic information systems that maintain electronic PII to allow access only to

---

[25] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth and medical record numbers.

[26] *See* 45 C.F.R. § 164.306 (Security standards and General rules); 45 C.F.R. § 164.308 (Administrative safeguards); 45 C.F.R. § 164.310 (Physical safeguards); 45 C.F.R. § 164.312 (Technical safeguards).

those persons or software programs that have been granted access rights in

violation of 45 C.F.R. § 164.312(a)(1);

f.   Failing to implement policies and procedures to prevent, detect, contain

and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.   Failing to identify and respond to suspected or known security incidents

and failing to mitigate, to the extent practicable, harmful effects of security

incidents that are known to the covered entity in violation of 45 C.F.R. §

164.308(a)(6)(ii);

h.   Failing to effectively train all staff members on the policies and

procedures with respect to PII as necessary and appropriate for staff

members to carry out their functions and to maintain security of PII in

violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.   Failing to design, implement, and enforce policies and procedures

establishing physical and administrative safeguards to reasonably

safeguard PII, in compliance with 45 C.F.R. § 164.530(c).

ii.   <u>HealthEC failed to adhere to FTC guidelines</u>

50.   According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[27] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as HealthEC, should employ to protect against the unlawful exposure of PII.

51.   In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[28] The guidelines explain that businesses should:

---

[27] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Sep. 2, 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[28] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Sep. 28, 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

a.    protect the personal customer information that they keep;

b.    properly dispose of personal information that is no longer needed;

c.    encrypt information stored on computer networks;

d.    understand their network's vulnerabilities; and

e.    implement policies to correct security problems.

The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

52.    The FTC recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[29]

53.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

54.    HealthEC's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

iii.    HealthEC failed to adhere to industry standards

55.    As stated above, the healthcare industry continues to be a high value target among cybercriminals. In 2017, the U.S. healthcare sector experienced over 330 data breaches, a number which continued to grow in 2018 (363 breaches).[30] The costs of healthcare data breaches are among

---

[29] *See Start with Security*, *supra* note 24.

[30] 2018 End of Year Data Brach Report, ITRC, (Feb. 20, 2019), https://www.idtheftcenter.org/ wp-

the highest across all industries, topping $380 per stolen record in 2017 as compared to the global average of $141 per record.[31] As a result, both the government and private sector have developed industry best standards to address this growing problem.

56.      The United States Department of Health and Human Services' Office for Civil Rights ("DHHS") notes that, "[w]hile all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations as they store large quantities of highly sensitive and valuable data."[32] DHHS highlights "several basic cybersecurity safeguards that can be implemented to improve cyber resilience which only require a relatively small financial investment, yet they can have a major impact on an organization's cybersecurity posture."[33] Most notably, organizations must properly encrypt PII in order to mitigate against misuse.

57.      The private sector has similarly identified the healthcare sector as particularly vulnerable to cyber-attacks both because of the of value of the PII that it maintains and because, as an industry, it has been slow to adapt and respond to cybersecurity threats.[34]

58.      Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, HealthEC failed to adopt sufficient data security processes, a fact highlighted by the fact that it did not detect the Data Breach for over three months after it happened.

59.      HealthEC failed to adequately train its employees on even the most basic of cybersecurity protocols, that could have prevented the Data Breach.

---

content/uploads/2019/02/ITRC_2018-End-of-Year Aftermath_FINAL_V2_ combinedWEB.pdf.
[31] *Id.*
[32] *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA JOURNAL (Nov. 1, 2018), https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/.
[33] *Id.*
[34] *10 Cyber Security Best Practices For the Healthcare Industry*, NTIVA (Jun. 19, 2018), https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry.

60.    HealthEC's failure to implement these rudimentary measures made it an easy target for the Data Breach that came to pass.

**E. Plaintiffs and the Class Members were significantly harmed by the Data Breach**

61.    As discussed above, PII is among the most sensitive, and personally damaging information. A report focusing on breaches in the healthcare industry found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000.00" per person, and that the victims were further routinely forced to pay out-of-pocket costs for health care they did not receive in order to restore coverage.[35]

62.    Victims of medical identity theft can suffer significant financial consequences. "In some cases, they [must pay] the healthcare provider, repa[y] the insurer for services obtained by the thief, or . . . engage[] an identity service provider or legal counsel to help resolve the incident and prevent future fraud."[36]

63.    Moreover, nearly half of identity theft victims lost their health care coverage as a result of a data breach incident, nearly one-third reported that their premiums went up, and forty percent never resolved their identity theft at all.[37]

64.    "Unfortunately, by the time medical identity theft is discovered, the damage has been done. Forty percent of consumers say that they found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that thieves incurred in their name. As a result, the consequences of medical identity theft are frequently severe, stressful and expensive to resolve."[38]

---

[35] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.
[36] *Fifth Annual Study on Medical Identity Theft*, PONEMON INSTITUTE LLC 1 (Nov. 18, 2015), https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65.
[37] *Id.*
[38] *The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches*, EXPERIAN (Apr. 13, 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

65.    Moreover, resolution of medical identity theft is time consuming to remedy. "Due to HIPAA privacy regulations, victims of medical identity theft must be involved in the resolution of the crime. In many cases, victims struggle to reach resolution following a medical identity theft incident."[39] Consequently, they remain at "risk for further theft or errors in [their] healthcare records that could jeopardize medical treatments and diagnosis."[40]

66.    As a result of the Data Breach, Plaintiffs and their children now face, and will continue to face, a heightened risk of identity theft and fraud for the rest of their lives.

67.    As a long-standing member of the healthcare community, HealthEC knew or should have known the importance of safeguarding patient PII entrusted to it and of the foreseeable consequences of a breach. Despite this knowledge, however, HealthEC failed to take adequate cyber-security measures to prevent the Data Breach from happening.

68.    HealthEC has not provided any compensation to patients victimized in the Data Breach and has not offered to provide any assistance or compensation for the costs and burdens— current and future—associated with the identity theft and fraud resulting from the Data Breach.

69.    Even if HealthEC did reimburse Plaintiffs for the harm they and their children suffered, it is incorrect to assume that reimbursing a victim of the Data Breach for financial loss due to fraud makes that individual whole again. On the contrary, after conducting a study, the U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[41]

---

[39] *Id.*

[40] *Id.*

[41] *Victims of Identity Theft, 2012*, U.S. DEP'T OF JUSTICE 10, 11 (Jan. 27, 2014), https://www.bjs.gov/content/pub/pdf/vit12.pdf.

70.     As a result of HealthEC's failure to prevent the Data Breach, Plaintiffs, their children and Class Members have suffered and will continue to suffer significant damages. They have suffered or are at increased risk of suffering:

a.     The loss of the opportunity to control how their PII is used;

b.     The diminution in value of their PII;

c.     The compromise, publication and/or theft of their PII;

d.     Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud, including the purchase of identity theft protection insurance and detection services;

e.     Lost opportunity costs and lost wages associated with the time and effort expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Disclosure, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

f.     Delay in receipt of tax refund monies;

g.     Unauthorized use of stolen PII;

h.     The continued risk to their PII, which remains in the possession of HealthEC and is subject to further breaches so long as HealthEC fails to undertake appropriate measures to protect the PII in their possession; and

i.     Current and future costs related to the time, effort, and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class members.

71.     Plaintiffs have already incurred harm as a result of the Data Breach.

72.     For example, to mitigate the heightened risk of identity theft and fraud that she now faces, Plaintiff Kendall Hawk must now monitor her credit reports to determine whether suspicious activity has occurred but is powerless to stop identity theft in advance.

73. Further, in an effort to mitigate the heightened risk of identity theft and fraud that she now faces, Plaintiff Lisa Bryson subscribed to a paid online credit monitoring service through Google One that provides identity theft protection services. While this credit monitoring service allows her to monitor her credit reports to determine whether suspicious activity has occurred, it is powerless to stop identity theft in advance and does not indemnify her from, or insure her against, the harm caused by the Data Breach.

74. Further, in an effort to mitigate the heightened risk of identity theft and fraud that she now faces, Plaintiff Trinity Whaley must monitor her credit reports to determine whether suspicious activity has occurred, but is powerless to stop identity theft in advance.

75. Further, in an effort to mitigate the heightened risk of identity theft and fraud that she now faces, Plaintiff Katelyn Crowe must monitor her credit reports to determine whether suspicious activity has occurred, but is powerless to stop identity theft in advance.

76. Finally, in an effort to mitigate the heightened risk of identity theft and fraud that she and her son now face, Abbey Robinson, individually and as mother and next friend of J.R., minor, must monitor her credit reports and her son's credit reports to determine whether suspicious activity has occurred, but is powerless to stop identity theft in advance.

77. Plaintiffs have also been forced, and will continue to be forced, to expend time and effort in order to mitigate the harm they have suffered on account of the Data Breach.

78. For example, Plaintiffs have expended considerable time and effort attempting to contact HealthEC and monitoring their and their children's identity and credit reports periodically, in addition to gathering documentation.

79. To his knowledge, Plaintiffs' s children have not been the victim of any other data breach.

## **CLASS ACTION ALLEGATIONS**

80. Plaintiffs bring this action on behalf of themselves, their children and as a class action on behalf of the following proposed class and subclass (collectively, "the Class"):

(Nationwide Class) All individuals whose PII was compromised in HealthEC's Data Breach.

> (Tennessee Subclass) All citizens of the State of Tennessee whose
> PII was compromised in HealthEC's Data Breach.

81.     Excluded from the Class are the officers, directors, and legal representatives of HealthEC and the judges and court personnel in this case and any members of their immediate families.

82.     This action is properly maintainable as a class action under Fed. R. Civ. Proc. 23.

83.     The Class is so numerous that joinder of all members would be impracticable. Upon information and belief, the Class consists of more than four million members, spread across numerous states.

84.     There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

  a.     Whether and to what extent HealthEC had a duty to protect the PII of Plaintiffs, their children and the Class;

  b.     Whether HealthEC failed to adopt the practices and procedures necessary to adequately safeguard the information compromised in the Data Disclosure;

  c.     Whether HealthEC adequately and accurately informed Class Members that their PII had been compromised;

  d.     Whether Class Members are entitled to actual damages, statutory damages, and/or punitive damages as a result of HealthEC's wrongful conduct; and

  e.     Whether Plaintiffs, their children and the Class are entitled to restitution as a result of HealthEC's wrongful conduct.

85.     Plaintiffs' claims are typical of those of other Class members because their PII and their children's PII, like that of every other Class member, was compromised by the Data Breach. Further, Plaintiffs and their children, like all Class members, were injured by HealthEC's uniform

conduct. Plaintiffs are advancing the same claims and legal theories on behalf of their children and all other Class members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of other Class members arise from the same operative facts and are based on the same legal theories.

86.    Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights Plaintiffs and their children suffered are typical of other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.

87.    The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the questions identified in Paragraph 84 above.

88.    A class action would provide substantial benefits over other methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

89.    The litigation of the claims brought herein is manageable. HealthEC's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

90.    Adequate notice can be given to Class members directly using information maintained in HealthEC's records.

91.     This proposed class action does not present any unique management difficulties.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### NEGLIGENCE and/or NEGLIGENCE *Per Se*

92.     Plaintiffs repeat and incorporate by reference the preceding paragraphs.

93.      As a condition of receiving population health technology services, Plaintiffs, their children and Class members were obligated to provide HealthEC with their PII.

94.     Plaintiffs, their children and the Class members entrusted their PII to HealthEC with the understanding that HealthEC would safeguard it.

95.     HealthEC had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs, their children and Class members could and would suffer if their PII were wrongfully disclosed.

96.     HealthEC had a duty to exercise ordinary and reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, *inter alia*, designing, maintaining and testing HealthEC's security protocols to ensure that Plaintiffs', their children's and Class members' PII in its possession was adequately secured and protected and that employees tasked with maintaining such information were adequately trained on cyber security measures regarding patient PII.

97.     Plaintiffs, their children and the Class members were the foreseeable and probable victims of any inadequate security practices and procedures that HealthEC employed. HealthEC knew of or should have known of the inherent risks in collecting and storing the PII of Plaintiffs, their children and the Class, the critical importance of providing adequate security of that PII, that it had inadequately trained its employees, and that its security protocols were insufficient to secure the PII of Plaintiffs, their children and Class members.

98.     HealthEC's own conduct created a foreseeable risk of harm to Plaintiffs, their children and Class members. HealthEC's misconduct included, but was not limited to, its failure to take the steps to prevent the Data Breach as set forth herein. HealthEC's misconduct also

included its decision to not comply with industry standards for the safekeeping and authorized disclosure of patient PII.

99.     Section 5 of the FTC Act prohibits "unfair…practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as HealthEC, of failing to use reasonable measures to protect PII/PHI. The FTC publications and orders described above also form part of the basis of HealthEC's duty in this regard.

100.     HealthEC further violated Section 5 of the FTC Act by failing to use reasonable measures to protect patient PII/PHI and not complying with applicable industry standards, as described herein. HealthEC's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiffs and Class members.

101.     HealthEC further violated the standard of care created by HIPAA, for the reasons as more fully explained, *ante*.

102.     Plaintiffs, their children and the Class members had no ability to protect their PII once they entrusted it to HealthEC.

103.     HealthEC has admitted that Plaintiffs', their children's and the Class members' PII was wrongfully disclosed to cybercriminals as a result of the Data Breach.

104.     HealthEC breached its duty to Plaintiffs, their children and the Class by failing to exercise ordinary and reasonable care in protecting and safeguarding their PII while it was within HealthEC's possession or control.

105.     HealthEC unlawfully breached its duty to Plaintiffs, their children and Class members by failing to have appropriate procedures in place to detect and prevent unauthorized dissemination of its patients' PII.

106.     HealthEC also unlawfully breached its duty to adequately disclose to Plaintiffs, their children and Class members the existence and scope of the Data Breach.

107. But for HealthEC's wrongful and negligent breach of duties owed to Plaintiffs, their children and Class members, Plaintiffs', their children's and Class Members' PII/PHI would not have been compromised.

108. As a result of HealthEC's negligence, Plaintiffs, their children and the Class have suffered and will continue to suffer damages and injury including, but not limited to, out-of-pocket expenses associated with mitigating against the heightened risk of identity theft and fraud caused by the Data Breach; the time and costs associated with remedying identity theft and fraud fairly attributable to the Data Breach; and time spent monitoring, addressing and correcting the current and future consequences of the Data Breach.

109. These harms are directly and proximately caused by the Data Breach.

## SECOND CLAIM FOR RELIEF

## INVASION OF PRIVACY

110. Plaintiffs repeat and incorporate by reference the preceding paragraphs.

111. Plaintiffs, their children and Class members took reasonable and appropriate steps to keep their PII confidential from the public.

112. Plaintiffs', their children's and Class members' efforts to safeguard their own PII were successful, as their PII was not known to the general public prior to the Data Breach.

113. Plaintiffs, their children, and Class members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

114. HealthEC owed a duty to its patients, including Plaintiffs', their children and Class members, to keep their PII confidential.

115. The unauthorized release of PII, especially PHI, is highly offensive to a reasonable person.

116. Plaintiffs', his children's and Class members' PII is not of legitimate concern to the public.

117.    HealthEC knew or should have known that Plaintiffs', his children's and Class members' PII was private, as HealthEC is a "covered entity" subject to HIPAA.

118.    HealthEC publicized Plaintiffs', his children's and Class members' PII, by communicating it to cyber criminals who had no legitimate interest in this PII and who had the express purpose of monetizing that information by injecting it into the illicit stream of commerce flowing through the dark web.

119.    Indeed, not only is Plaintiffs', his children's and Class members' PII traveling the dark web, but it is being used to commit fraud; it is being disseminated amongst, *inter alia*, merchants, creditors, health care providers and governmental agencies.

120.    It is therefore substantially certain that the Plaintiffs', his children's and the Class members' PII is rapidly becoming public knowledge – among the cybercriminal community writ large – due to the nature of the Data Breach that procured it, and the identity theft that it is designed for.

121.    Unless and until enjoined, and restrained by order of this Court, HealthEC's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs, their children and Class Members in that HealthEC's inadequate data security measures will likely result in additional data breaches. Plaintiffs, their children and Class members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further invasions of the Plaintiffs', their children's and Class members' privacy by HealthEC.

### THIRD CLAIM FOR RELIEF

### BREACH OF CONFIDENCE

122.    Plaintiffs repeat and incorporate by reference the preceding paragraphs.

123.    Plaintiffs and Class members conveyed confidential and novel information to HealthEC, their PII.

124.    HealthEC had knowledge that the PII was disclosed to it in confidence.

125.    There was an understanding between HealthEC and Plaintiffs and Class members that the confidence of their PII be maintained.

126.    HealthEC breached the confidences Plaintiffs and Class members formed with it by disclosing their PII to cybercriminals.

127.    Unless and until enjoined, and restrained by order of this Court, HealthEC's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that HealthEC's inadequate data security measures will likely result in additional data breaches. Plaintiffs and Class members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further breaches of confidence by HealthEC.

**FOURTH CLAIM FOR RELIEF**

**BREACH OF CONTRACT INCLUDING THE COVENANT**

**OF GOOD FAITH AND FAIR DEALING**

128.    Plaintiffs repeat and incorporate by reference the preceding paragraphs.

129.    HealthEC offered to provide population health technology services to Plaintiffs and Class members in exchange for payment.

130.    Plaintiffs, their children and the Class accepted HealthEC's offer to provide pediatric behavioral health services by paying for them and receiving said services.

131.    HealthEC required Plaintiffs, their children and Class members to provide their PII, including name, address, date of birth, Social Security number, Taxpayer Identification number, Medical Record number, Medical information (including but not limited to Diagnosis, Diagnosis Code, Mental/Physical Condition, Prescription information, and provider's name and location), Health insurance information (including but not limited to beneficiary number, subscriber number, Medicaid/Medicare identification), and/or Billing and Claims information (including but not limited to patient account number, patient identification number, and treatment cost information) in order to receive services from HealthEC.

132.    Plaintiffs and Class members exchanged valuable consideration – money – with HealthEC for goods and services, a crucial part of which was HealthEC's promise to protect their PII from unauthorized disclosure.

133.   Necessarily implicit in the agreement between HealthEC and its patients, including Plaintiffs, their children and Class members, was HealthEC's obligation to use such PII for business and treatment purposes only, to take reasonable steps to secure and safeguard that PII, and not make disclosures of the PII to unauthorized third parties.

134.   Further implicit in the agreement, HealthEC was obligated to provide Plaintiffs, their children and the Class with prompt and adequate notice of any and all unauthorized access and/or theft of their PII.

135.   Plaintiffs, their children and the Class would not have entrusted their PII to HealthEC in the absence of such agreement with HealthEC.

136.   HealthEC materially breached the implied contract(s) they had entered with Plaintiffs, their children and Class members by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. HealthEC further breached the implied contracts with Plaintiffs, their children and Class members by:

     a.     Failing to properly safeguard and protect Plaintiffs' s children's and Class members' PII;

     b.     Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement;

     c.     Failing to ensure the confidentiality and integrity of electronic PII that HealthEC created, received, maintained and transmitted in violation of 45 C.F.R. § 164.306(a)(1).

137.   The damages sustained by Plaintiffs and Class members as described above were the direct and proximate result of HealthEC's material breaches of its agreements.

138.   Plaintiffs, their children and Class members have performed as required under the relevant agreements, or such performance was waived by the conduct of HealthEC.

139.   Under the laws of Tennessee, good faith is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with

honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

140.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

141.    HealthEC failed to promptly advise Plaintiffs, their children and the Class of the Data Breach.

142.    In these and other ways, HealthEC violated its duty of good faith and fair dealing.

143.    Plaintiffs, their children and members of the Class have sustained damages as a result of HealthEC's breaches of the Contract, including breaches of the Contract through violations of the covenant of good faith and fair dealing.

## FIFTH CLAIM FOR RELIEF

### TRESPASS TO CHATTELS

144.    Plaintiffs repeat and incorporate by reference the preceding paragraphs.

145.    Plaintiffs, their children and the Class entrusted their PII to HealthEC with the understanding that it would keep that information confidential.

146.    HealthEC intentionally dispossessed the Plaintiffs, their children and the putative members of the Class of their PII and/or used or intermeddled with the Plaintiffs, their children 's and the putative members of the Class's possession of their PII, when it allowed cybercriminals to access it, going far beyond the bounds of any consent Plaintiffs and the Class bestowed upon HealthEC.

147.    As explained at length above, Plaintiffs, their children and the Class members were damaged thereby.

**SIXTH CLAIM FOR RELIEF**

**BAILMENT**

148.    Plaintiffs repeat and incorporate by reference the preceding paragraphs.

149.    Plaintiffs, their children the Class, and HealthEC contemplated a mutual benefit bailment when the Plaintiffs, their children and putative members of the Class transmitted their PII to HealthEC solely for treatment and the payment thereof.

150.    Plaintiffs', their children's and the Class's PII was transmitted to HealthEC in trust for a specific purpose (treatment), with an implied contract that the trust was to be faithfully executed, and the PII was to be accounted for when the special purpose was accomplished.

151.    HealthEC was duty bound under the law to exercise ordinary care and diligence in safeguarding Plaintiffs', their children's and the Class's PII.

152.    Plaintiffs', their children's and the Class's PII was used for a different purpose than the Plaintiffs, their children and the Class intended, for a longer time period and/or in a different manner or place than the parties intended.

153.    As explained at length above, Plaintiffs and the Class were damaged thereby.

**SEVENTH CLAIM FOR RELIEF**

**UNJUST ENRICHMENT**

154.    Plaintiffs repeat and incorporate by reference the preceding paragraphs.

155.    In the alternative to the claims alleged above, Plaintiffs allege that they have no adequate remedy at law and bring this unjust enrichment claim on behalf of themselves, their children and the Class Members.

156.    Plaintiffs, their children and Class Members conferred a monetary benefit on HealthEC in the form of payment for healthcare services. Plaintiffs, their children and Class Members also provided their PII to HealthEC.

157.    The money that Plaintiffs, their children and Class Members paid, directly or indirectly, to HealthEC should have been used by it, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

158.     As a result of HealthEC's conduct described herein, Plaintiffs, their children and Class Members suffered actual damages in an amount equal to the difference in value between healthcare services associated with the reasonable data privacy and security practices and procedures that Plaintiffs, their children and Class Members paid for, and the inadequate healthcare services without reasonable data privacy and security practices and procedures that they received.

159.     Under principles of equity and good conscience, HealthEC should not be permitted to retain money belonging to Plaintiffs, their children and Class Members because HealthEC failed to use that money to implement the reasonable data privacy and security practices and procedures that Plaintiffs, their children and Class Members paid for and that were otherwise mandated by HIPAA regulations, federal and state law, and industry standards and best practices.

160.     HealthEC should be compelled to disgorge into a common fund for the benefit of Plaintiffs, their children and Class Members all unlawful or inequitable proceeds received by HealthEC.

161.     A constructive trust should be imposed upon all unlawful or inequitable sums received by HealthEC traceable to Plaintiffs, their children and Class Members.

## EIGHTH CLAIM FOR RELIEF

### CONVERSION

162.     Plaintiffs repeat and incorporate by reference the preceding paragraphs.

163.     At all times relevant hereto, Plaintiffs, their children and Class Members had ownership rights to their PII.

164.     HealthEC engaged in the wrongful act of disposing of the PII by giving cyber criminals access to it.

165.     As explained at length above, Plaintiffs, their children and the Class were damaged thereby.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually, on behalf of themselves, their minor children and all others similarly situated, requests the following relief:

A.      An Order certifying this action as a class action and appointing Plaintiffs as Class representative and their counsel as Class counsel;

B.      A mandatory injunction directing HealthEC to safeguard the PII of Plaintiffs, their children and the Class hereinafter adequately by implementing improved security procedures and measures;

C.      A mandatory injunction requiring that HealthEC provide notice to each member of the Class relating to the full nature and extent of the Data Breach and the disclosure of PII to unauthorized persons;

D.      An award of compensatory, restitutionary, punitive, exemplary, and statutory damages, as permitted by law.

E.      An award of attorneys' fees and costs;

F.      An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law; and

G.      Such other and further relief as this court may deem just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands a trial by jury on all issues so triable.

Dated: February 6, 2024                  Respectfully submitted,

                                By:     */s/ Patrick Howard*
                                        Patrick Howard (NJ Atty ID #02280-2001)
                                        phoward@smbb.com
                                        **SALTZ MONGELUZZI & BENDESKY, P.C.**
                                        8000 Sagemore Drive, Suite 8303
                                        Marlton, NJ 08053
                                        Tel: (856) 751-0868

                                        Joe P. Leniski, Jr.*
                                        joey@hsglawgroup.com
                                        **HERZFELD, SUETHOLZ, GASTEL,
                                        LENISKI & WALL, PLLC**
                                        223 Rosa L. Parks Avenue, Suite 300
                                        Nashville, Tennessee 37203
                                        Tel: (615) 800-6225

Peter J. Jannace\*
peter@hsglawgroup.com
**HERZFELD, SUETHOLZ, GASTEL,**
**LENISKI & WALL, PLLC**
515 Park Avenue
Louisville, Kentucky 40208
Tel: (502) 636-4333

*Attorneys for Plaintiffs Kendall Hawk, Lisa Bryson,*
*Trinity Whaley, Katelyn Crowe and Abbey Robinson*
*individually and as mother and next friend of J.R.,*
*minor,*

*\*Pro Hac Vice admission forthcoming*